E-FILED
Thursday, 18 January, 2007  11:42:53 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  06-3052 |
| | ) | |
| CHARLES E. BOX, LULA M. | ) | |
| FORD, ROBERT F. LIEBERMAN, | ) | |
| ERIN M. O'CONNELL-DIAZ, | ) | |
| and KEVIN K. WRIGHT, in their | ) | |
| official capacities as Commissioners of | ) | |
| the Illinois Commerce | ) | |
| Commission, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on cross motions for summary judgment.  See Plaintiffs' Motion for Summary Judgment (d/e 20) (Plaintiffs' Motion); Defendant's [sic] Combined Response to Plaintiff's [sic] Motion for Summary Judgment and Cross Motion for Summary Judgment (d/e 22) (Defendants' Motion).  Plaintiffs bring this action against Defendants Charles E. Box, Lula M. Ford, Robert F. Lieberman, Erin M. O'Connell-Diaz, and Kevin K. Wright, all of whom are Commissioners

1

of the Illinois Commerce Commission (collectively the Commissioners), alleging that the Illinois Railroad Employees Medical Treatment Act (IREMTA), 601 ILCS 107/1-10, is preempted by the Federal Railroad Safety Act of 1970 (FRSA), as amended 49 U.S.C. §§ 20101-53.  The Plaintiffs seek injunctive and declaratory relief.  Specifically, the Plaintiffs are seeking an injunction barring enforcement of the IREMTA and a declaration that the IREMTA is preempted by the FRSA.  The Defendants are sued in their official capacities.  For the reasons stated below, Plaintiffs' Motion for Summary Judgment is ALLOWED, and the Defendants' Motion for Summary Judgment is DENIED.

## BACKGROUND

Plaintiffs are freight or passenger railroad carriers operating in Illinois.[1] BNSF Railway Company is a freight railroad carrier engaged in interstate or foreign commerce within the meaning of the FRSA, operating in Illinois. Plaintiff Soo Line Railroad Company, d/b/a Canadian Pacific Railway, is a freight railroad carrier engaged in interstate or foreign commerce within the meaning of the FRSA, maintaining approximately 450 employees in its

---

[1]The Court notes that eight of the nine Plaintiffs are freight railroad carriers and the other is a passenger railroad carrier.

Illinois operations.  Plaintiff CSX Transportation, Inc., is a freight railroad carrier engaged in interstate or foreign commerce within the meaning of the FRSA, maintaining approximately 1,000 employees in its Illinois operations. Plaintiff Illinois Central Railroad Company is a freight railroad carrier engaged in interstate or foreign commerce within the meaning of the FRSA, with 1,548 employees in its Illinois operations.  Plaintiff The Kansas City Southern Railway Company is a freight railroad carrier engaged in interstate or foreign commerce within the meaning of the FRSA, with approximately 85 employees in its Illinois operations.   Plaintiff National Railroad Passenger Corporation, d/b/a Amtrak, is a passenger railroad carrier engaged in interstate or foreign commerce within the meaning of the FRSA, with approximately 1,614 employees in its Illinois operations.  Plaintiff Norfolk Southern Railway Company is a freight railroad carrier engaged in interstate or foreign commerce within the meaning of the FRSA, maintaining approximately 1,701 employees in its Illinois operations.  Plaintiff Toledo, Peoria & Western Railway is a freight railroad carrier engaged in interstate or foreign commerce within the meaning of the FRSA, with approximately 42 employees in its Illinois operations.  Plaintiff Union Pacific Railroad Company is a freight railroad carrier engaged in interstate or foreign

commerce within the meaning of the FRSA, with approximately 4,011 employees in its Illinois operations.

The Defendants are Commissioners of the Illinois Commerce Commission (the Commission), a quasi-judicial Illinois administrative agency created by Article II of the Illinois Public Utilities Act, 200 ILCS 5/2-101, et seq.  The Commission derives its power to regulate certain activities of rail carriers operating within the State of Illinois, including the Plaintiffs, from the Illinois Commercial Transportation Law, 625 ILCS5-18c-1101, et seq.  Each Defendant is sued in his or her official capacity as a Commissioner.[2]

A.    Statutory Background

1.    Federal Railroad Safety Act

Congress enacted the FRSA of 1970 for the purpose of "promot[ing] safety in every area of railroad operations and reduc[ing] railroad-related accidents and incidents."  49 U.S.C. § 20101.[3]  "The FRSA was enacted

_____

[2]The Court notes that on January 10, 2006, Defendant Charles E. Box was appointed Chairman of the Commission by Illinois Governor Rod Blagojevich. Defendant Box is awaiting confirmation by the Illinois Senate.

[3]The Court notes that the "FRSA was formerly codified at 45 U.S.C. 421 et seq. but was recodified without substantive change in Title 49 as part of a recodification of rail safety laws in 1994.  See Pub. L. No. 103-272.  Many prior court decisions interpreting FRSA refer to the prior U.S. Code sections."  Burlington Northern and

under Congress' constitutional authority to regulate interstate commerce with the intent of providing uniform national regulation of railroad operations." Michigan Southern Railroad Company v. City of Kendallville, 251 F.3d 1152, 1154 (7th Cir. 2001). This congressional intent is evidenced in the legislative history of the FRSA. "The House Committee on Interstate and Foreign Commerce, to whom the bill was referred, concluded in its report that safety in the nation's railroads would not be advanced by subjecting the national rail system to a variety of enforcement and conflicting requirements in 50 different jurisdictions." National Association of Regulatory Utilities Commissioners v. Coleman, 542 F.2d 11, 13-14 (3d Cir. 1976) (citing 1970 U.S. Code Cong. & Admin News, p. 4109)). Under the FRSA, the Secretary of Transportation is authorized to promulgate and issue regulations and orders for every area of railroad safety. Id. (citing 49 U.S. C. § 20103(a)). In exercising this authority vested under the FRSA, the Secretary has delegated to the Federal Railroad Administration (FRA) the authority to prescribe regulations and issue orders pertaining to railroad safety. Union Pacific Railroad Company v. California Public Utilities Commission, 346 F.3d 851, 858 (9th Cir. 2003).

---

Santa Fe Railway Company v. Doyle, 186 F.3d 790, 795 n. 3 (7th Cir. 1999).

Section 20106 of the FRSA provides that: "Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106.[4] There are two exceptions to this general rule: (1) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement; and (2) A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order -- [(a)] is necessary to eliminate or reduce an essentially local safety or security hazard; [(b)] is not incompatible with a law, regulation, or order of the United States Government; and [(c)] does not unreasonably burden interstate commerce.  Id. (quotations omitted).

In carrying out its duties, the FRA has promulgated numerous regulations pertaining to railroad safety, one of which is 49 C.F.R. 225.33. This regulation mandates railroads adopt an internal control plan that

---

[4]This preemption provision was formerly codified at 45 U.S.C. § 434.

includes a policy statement indicating that harassment or intimidation of

any person that is calculated to discourage or prevent such person from

receiving medical treatment or from reporting such accident or injury

(harassment/intimidation policy) is prohibited.[5]   The FRA has stated that

---

[5]Specifically, § 225.33 reads in relevant part:

(a) Each railroad shall adopt and comply with a written Internal Control
Plan that shall be maintained at the office where the railroad's reporting
officer conducts his or her official business.  Each railroad shall amend its
Internal Control Plan, as necessary, to reflect any significant changes to the
railroad's internal reporting procedures.  The Internal Control Plan shall be
designed to maintain absolute accuracy and shall include, at a minimum,
each of the following components:

> (1) A policy statement declaring the railroad's commitment to
> complete and accurate reporting of all accidents, incidents, injuries,
> and occupational illnesses arising from the operation of the railroad,
> to full compliance with the letter and spirit of FRA's accident
> reporting regulations, and to the principle, in absolute terms, that
> harassment or intimidation of any person that is calculated to
> discourage or prevent such person from receiving proper medical
> treatment or from reporting such accident, incident, injury or illness
> will not be permitted or tolerated and will result in some stated
> disciplinary action against any employee, supervisor, manager, or
> officer of the railroad committing such harassment or intimidation.
> (2) The dissemination of the policy statement; complaint
> procedures.  Each railroad shall provide to all employees, supervisory
> personnel, and management the policy statement described in
> paragraph (a)(1).  Each railroad shall have procedures to process
> complaints from any person about the policy stated in paragraph
> (a)(1) being violated, and to impose the appropriate prescribed
> disciplinary actions on each employee, supervisor, manager, or
> officer of the railroad found to have violated the policy.  These
> procedures shall be disclosed to railroad employees, supervisors,
> managers, and officers.  The railroad shall provide "whistle blower"
> protection to any person subject to this policy, and such policy shall
> be disclosed to all railroad employees, supervisors and management.

49 C.F.R. § 225.33.

the purpose of regulations in part 225 "is to provide the Federal Railroad Administration with accurate information concerning the hazards and risks that exist on the Nation's railroads." 49 C.F. R. § 225.1. Further, under the FRSA, a civil monetary penalty of $2,500.00 is assessed against any railroad employees or the railroads themselves that violate the harassment/intimidation policy set forth in § 225.33. A civil monetary penalty of $5,000.00 is imposed for a willful violation. 49 C.F.R. Pt. 225, App. A.

2.   <u>Illinois Railroad Employees Medical Treatment Act</u>

On May 28, 2005, the Illinois General Assembly enacted the IREMTA at issue in this case. The IREMTA became effective on January 1, 2006. The enactment of IREMTA addresses Illinois' concern that the railroad employees injured in the course of employment are not afforded prompt medical treatment due to employer interference. The IREMTA mandates the railroads to make a good faith effort to provide prompt medical attention or treatment for a railroad employee injured in the course of employment. The IREMTA further states that it is unlawful for railroads and their employees to deny, delay, or interfere with medical treatment of employees injured on the job, or discipline or threaten discipline to an

employee injured on the job for seeking medical treatment or for following the orders or treatment plan of his or her treating physician.  The IREMTA is enforced through civil penalties.  The IREMTA authorizes the imposition of a civil monetary penalty of up to $10,000.00 for each violation.[6]

The Bill's chief sponsor and others advocating the passage of IREMTA noted that the primary purpose of the statute was to ensure prompt medical attention to railroad employees injured in the course of their employment,

---

[6]The IREMTA provides:

§ 10. Railroad employee access to first aid or medical treatment.

(a)     A railroad shall make a good faith effort to provide medical attention for a railroad employee who is injured in the course of his or her employment.

(b)     It is unlawful for a railroad or person employed by a railroad to:
(1) deny, delay or interfere with medical treatment or first aid treatment to an employee of that railroad who has been injured during employment; or
(2) discipline or threaten discipline to an employee of a railroad who has been injured during employment for (i) requesting medical or first aid treatment or (ii) following the orders or treatment plan of his or her treating physician.

(c)     Nothing in this Section shall be construed to require a railroad or railroad employee to perform first aid or medical care.

(d)     This section does not prevent an employer from:
(1) noting in an employee's record that an injury occurred; or
(2) offering light duty or an alternate work assignment to an injured employee if the light duty or alternate work assignment does not conflict with the orders or treatment plan of the employee's treating physician.

(e)     The Commission has exclusive jurisdiction to determine violations of this Section.  If, after a proper complaint and hearing, the Commission determines that a violation has occurred, the Commission shall impose, for each violation, a penalty in an amount not exceeding $10,000.  This penalty is the exclusive remedy for any violation of this Section.  The Commission shall give priority to any complaint alleging a violation of this Section and shall issue its decision as promptly as possible.

610 ILCS 107/10.

without any employer interference.  In strongly supporting the passage of the statute, Illinois State Representative Lang stated the following during a debate in the Illinois General Assembly regarding the need for the statute:

> Apparently, there are file folders filled with complaints from railroad workers about delay in treatment for injuries and lack of management dealing with these problems in an appropriate way.  I think if any of us were injured on this job or any other job we have, we'd wanna to [sic] make sure that we got attended to immediately. . . .  The simple message [of this Bill] is that when you're injured on the job and your employer knows about it your employer shouldn't stand in the way of having your injuries treated.  That's all this Bill is about.

Plaintiffs' Motion, Exh. E., State of Illinois, 94th General Assembly, House of Representatives, Transcription Debate (April 13, 2005), at 157.

## ANALYSIS

The parties move for summary judgment.  Plaintiffs ask for summary judgment, asserting that the IREMTA has been preempted by the FRSA and its regulation, namely 49 C.F.R. § 225.33.  The Defendants likewise move for summary judgment, contending that: (1) the issue presented in this case (whether IREMTA has been preempted by the FRSA) is not ripe for judicial resolution; (2) the Plaintiffs lack standing to bring this lawsuit; (3) FRSA and § 225.33 do not preempt the IREMTA because the FRA was not authorized under the FRSA of 1994 to issue the regulation and so § 225.33

is "ultra vires" and "void ab initio"; and (4) Section 225.33 does not cover the subject matter addressed by IREMTA because the regulation does not substantially subsume the subject matter of the state law.

At summary judgment, the moving party must present evidence that demonstrates the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party. Any doubt as to the existence of a genuine issue for trial must be resolved against the moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  Once the moving party has met his or her burden, the non-moving party must present evidence to show that issues of fact remain with respect to an issue essential to his or her case, and on which he or she will bear the burden of proof at trial.  <u>Celotex Corp.</u>, 477 U.S. at 322; <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

A.    <u>Defendants' Challenges to the Plaintiffs' Exhibits</u>

Before turning to the parties' Motions for Summary Judgment, the Court first addresses Defendants' challenges to the Plaintiffs' exhibits. Defendants object to various exhibits submitted by the Plaintiffs, such as

copies of the FRA Inspection Reports and Violation Notices and copies of complaints from railroad employees and/or their union representatives grieving that the Plaintiffs have harassed or intimidated the employees for seeking prompt medical treatment.[7] See Plaintiffs' Motion, Exhs. D(1), D(2), D(3), FRA Inspection Reports and Violation Notices; Exh. G, Employee and Union Complaints of Railroad Interference with Medical Treatment (Employee and Union Complaints).  The Defendants challenge the FRA Inspection Reports and Violation Notices on the grounds that they contain hearsay and speculation.  Exhibits D(1), D(2) and D(3) contain the FRA Inspection Reports and Violation Notices relating to Plaintiffs Amtrak, Norfolk Southern Railway Company, BNSF Railway Company, CSX Transportation, Inc., Union Pacific Railroad Company, and Illinois Central Railroad Company.  Each of these Plaintiffs has submitted a declaration establishing the authenticity of the documents.  See Attachments to Plaintiffs' Combined Response in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion (d/e 23)

---

[7]The Court notes that Defendants have not filed a separate motion objecting to the Plaintiffs' exhibits, but make their objections to the Plaintiffs' exhibits in their Combined Response to the Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment.

(Plaintiffs' Combined Response).

The Court has reviewed the submissions and finds that the FRA Inspection Reports and Violation Notices fall within a recognized hearsay exception. The documents are public records and reports; thus, they clearly fall within Federal Rule of Evidence 803(8).[8] As such, the Court will consider the documents.

Defendants also challenge copies of complaints filed by railroad employees and/or their union representatives, asserting that Plaintiffs Union Pacific Railroad Company, The Kansas City Southern Railway Company, Amtrak, Norfolk Southern Railway Company, CSX Transportation, Inc., Canadian Pacific Railway, and Illinois Central Railroad Company have harassed their employees for seeking prompt medical treatment, claiming that they contain hearsay statements. These Plaintiffs have submitted Declarations establishing the authenticity of the complaints. See Attachments to Plaintiffs' Combined Response. In response, Plaintiffs assert that these documents were not submitted for the truth of the matters

---

[8]Rule 803(8) states that "[r]ecords, reports, . . . in any form, of public offices or agencies, setting forth . . . matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . ." come within the hearsay exception. Fed. R. Evid. 803(8).

asserted, but simply to demonstrate the frequency of complaints concerning medical treatment.  Since they are not offered for the truth of the matters asserted, the reports are not hearsay.  The Court will consider the complaints for the limited purpose of showing the frequency of complaints filed by railroad employees and/or their union representatives regarding employer interference with medical treatment.

B.    Justiciability

1.    Ripeness

Before adjudicating the merits of this case, the Court must address as a threshold matter whether the Plaintiffs have presented sufficient evidence to show that "a case or controversy [exists] within the meaning of Art. III of the Constitution or only abstract questions not currently justiciable by a federal court."  Babbitt v. United Farm Workers National Union, 442 U.S. 289, 297 (1979).  Under Article III of the United States Constitution, a party seeking to invoke federal court jurisdiction must present an actual case or controversy, a requirement that is referred to as the concept of justiciability.  See Flast v. Cohen, 392 U.S. 83, 95 (1968).  The purpose of the requirement is to ensure that a plaintiff has "'a personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the

presentation of issues' necessary for the proper resolution of constitutional questions." <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101 (1983). When a plaintiff challenges a state statute (as in this case) he or she must demonstrate that the enforcement of the statute would subject him or her to a realistic threat of direct injury. <u>Babbitt</u>, 442 U.S. at 298. To obtain relief, however, the plaintiff need not "await the consummation of threatened injury . . . ." <u>Id.</u> "If the injury is certainly impending, that is enough." <u>Id.</u> (citing cases).

The Defendants dispute that this case is ripe for judicial action. "The ripeness doctrine deals with the time, if any, at which a party may seek pre-enforcement review of a statute or regulation. It seeks to avoid the premature adjudication of cases when the issues posed are not fully formed, or when the nature and extent of the statute's application are not certain." <u>Triple G. Landfills, Inc. v. Board of Commissioners of Fountain County, Indiana</u>, 977 F.2d 287, 288-89 (7th Cir. 1992) (internal citations omitted). To determine whether an issue is ripe for judicial adjudication, two questions are asked: (1) whether the relevant issues are "sufficiently focused" and developed so as to permit judicial resolution, without awaiting further factual development of the issues posed, and (2) whether the

postponement of the judicial resolution would cause hardship and injury to the parties.  Id. at 289.

Applying the test outlined above, the Court finds that the first factor weighs in favor of finding this case ripe for judicial review because the preemption issue is fully formed and sufficiently developed.  See id.  As in Triple G. Landfills, Inc., the preemption issue -- whether § 225.33 preempts IREMTA -- is primarily an issue of law and no further factual development is necessary because, since the effective date of IREMTA, the Plaintiffs are affirmatively obligated under the statute to make a good faith effort to provide prompt medical attention to employees injured while performing their work duties.  Under IREMTA, the Plaintiffs and their employees are also prohibited from denying, delaying, or interfering with medical treatment to an injured employee.  Plaintiffs and their employees are further prohibited from disciplining or threatening discipline to an employee of a railroad who has been injured during employment for seeking medical or first aid treatment or following the orders or treatment plan of his or her treating physician.  A civil monetary penalty of up to $10,000.00 can be assessed against the railroads, including the Plaintiffs, for each violation of the Illinois statute.  The question of whether these requirements are

preempted by § 225.33 is, thus, sufficiently focused.  The first factor, therefore, weighs in favor of finding that the preemption issue posed in this case is ripe for judicial resolution.

Similarly, the second prong of the relevant test weighs in favor of finding the preemption issue ripe for judicial review.  The postponement of judicial review of the issue posed here would cause hardship to the parties. The record reveals that the Commissioners have not disclaimed or disavowed their intention to enforce the state statute.  As such, the Plaintiffs are currently not only obligated to comply with the mandates of the FRSA, but also under duty to comply with the mandates of the IREMTA.  In effect, the enforcement of the IREMTA would place burdens on the Plaintiffs to devise mechanisms to comply with the mandates of the IREMTA as well as § 225.33.  The Plaintiffs' failure to comply with the mandates of the IREMTA would subject the Plaintiffs to a civil monetary penalty of up to $10,000.00 for each violation.  In addition, delay of judicial review would undermine and frustrate § 20106 of the FRSA which provides that laws, regulations, and orders related to railroad safety or security shall be nationally uniform to the extent practicable.  49 U.S.C. § 20106.  In light of these reasons, the Court sees no need to delay judicial review of this

case.

The Commissioners, however, argue that the preemption issue is not ripe for judicial resolution because the Plaintiffs have failed to allege that they intend to engage in any conduct prohibited by or contrary to the provisions set forth in the IREMTA, a requirement which the Commissioners argue is necessary to render an issue ripe for judicial resolution.   Defendants rely on <u>Babbitt</u> for this proposition.   The Commissioners contend that "[a]fter all, since [the Plaintiffs] do not seek to engage in the conduct prohibited by the statute they cannot claim that their actions are somehow being limited or constrained by the statute." <u>Defendants' Motion</u>, at 10.

Defendants' argument is unpersuasive.   As an initial matter, the Defendants are correct that the <u>Babbitt</u> Court has specifically stated that a case is ripe "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder . . . ." <u>Babbitt</u>, 442 U.S. at 298; <u>Commodity Trend Service, Inc. v. Commodity Futures Trading Commission</u>, 149 F.3d 679, 683 (7th Cir. 1998).  Defendants' reliance on <u>Babbitt</u> is misplaced, however.  In <u>Babbitt,</u>

farmworkers, a farmworkers' union, a union agent, and a union supporter challenged the constitutionality of the Arizona Agricultural Employment Relations Act.  The <u>Babbitt</u> Court examined the constitutionality of five provisions in the Arizona statute, one of which was the provision providing for election procedures for employee bargaining representatives.   The <u>Babbitt</u> Court found that the plaintiffs' challenges to the Act's provision "designat[ing] procedures governing the election of employee bargaining representatives" presented a real case or controversy and was ripe for judicial action even though the plaintiffs had not only failed to invoke the Act's election procedures, but had also failed to express their intention of doing so in the future.[9]  <u>Babbitt</u>, 442 U.S. at 293, 299.  This was because, according to the <u>Babbitt</u> Court, the nature of the plaintiffs' claim "that the delays assertedly attending the statutory election scheme and the technical limitations on who may vote in unit elections severely curtail[ed] [the plaintiffs'] freedom of association."  <u>Id.</u> at 312.  The <u>Babbitt</u> Court determined that there was no reason to delay judicial resolution of the

---

[9]The plaintiffs in <u>Babbitt</u> complained that the Arizona statute's election procedures "entail[ed] inescapable delays and so preclude[d] conducting an election promptly enough to permit participation by many farmworkers engaged in the production of crops having short seasons."  <u>Babbitt</u>, 442 U.S. at 299.  The plaintiffs additionally complained about the election procedures' "assertedly austere limitations on who is eligible to participate in elections under the Act."  <u>Id.</u>

plaintiffs' challenge to the election procedures in the Arizona statute not only because of the nature of plaintiffs' claim implicating First Amendment concerns, but also because the delay would not assist the resolution of the threshold question of whether the election procedures were subject to scrutiny under the First Amendment, a question which the <u>Babbitt</u> Court believed was dispositive of the plaintiffs' challenge. <u>Id.</u> at 299-301.  <u>Babbitt</u> therefore teaches that, even in the absence of an allegation that the plaintiffs intended to engage in any conduct prohibited by or contrary to a challenged statute, a case may nonetheless be ripe for judicial resolution under certain circumstances.

In addition, the Supreme Court has recently stated that a plaintiff need not expose himself or herself to liability or engage in conduct violative of the statute in question before the plaintiff could seek a declaratory judgment regarding the validity of the statute.   <u>MedImmune, Inc. v. Genentech, Inc.</u>, 2007 WL 43797, at *5 (U. S. Jan. 9, 2007).

The evidence presented in this case renders Plaintiffs' claim ripe for judicial review.  The Defendants are correct that the Plaintiffs do not allege in their Complaint (d/e 1) that they intend to engage in any conduct prohibited by or contrary to the provisions set forth in the IREMTA.  In

20

their Motion for Summary Judgment, however, the Plaintiffs have submitted sufficient evidence demonstrating that a threat of prosecution against the Plaintiffs is imminent, impending, and more than speculative, and thus to warrant judicial resolution of the preemption issue posed in this case.  See Commodity Trend Services, Inc., 149 F.3d at 687.

2.   Standing

Under the case or controversy requirement, a plaintiff seeking to invoke the power of the federal court bears the burden of demonstrating that he or she has standing.  The plaintiff has standing if he or she demonstrates: (1) an "injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) a causal connection between the injury and the conduct complained; and (3) that a favorable decision likely will redress the injury.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992) (internal quotations and citations omitted).

The Plaintiffs have standing to bring this lawsuit.  The Seventh Circuit has recently stated that "[t]he catalog of decisions that conduct [pre-enforcement review even] before a rule has gone into force, and hence long before prosecution is 'imminent,' is extensive."  520 Michigan Avenue

Associates, Ltd. v. Devine, 433 F.3d 961, 963 (7th Cir. 2006).  In support of this finding, the Devine Court referred to various Supreme Court decisions in which the Supreme Court engaged in "pre-enforcement review based on the potential cost that compliance (or bearing a penalty) create[d][,]" one of which was Pierce v. Society of the Sisters, 268 U.S. 510 (1925).  Id.  The plaintiff in that case was able to obtain judicial review of a state statute requiring all children to attend public schools, even though the statute itself would not be effective until two years later.  In so holding, the Pierce Court was mindful of "the potential cost that compliance [with the statute at issue] (or bearing a penalty) create[d]."  Id.  The Seventh Circuit also noted that in Abbott Laboratories v. Gardner, the Supreme Court entertained pre-enforcement review of a regulation whose effective date lay in the future because "[c]osts that the [drug] manufacturers would incur in preparing to comply (or the legal risks they would incur in not doing so) supplied standing" to the plaintiffs.  Id.; Gardner, 387 U.S. 136 (1967).

The need for pre-enforcement review in this case is perhaps more compelling than the aforementioned cases.  The IREMTA has been effective since January of 2006 and the Commissioners have neither disclaimed nor

disavowed their intention to enforce the statute.  Further, the Plaintiffs have submitted evidence showing that on-the-job accidents for railroad employees are not rare.  In fact, in 2004, 296 employees of the Plaintiffs suffered FRA reportable on-the-job injuries in Illinois.  <u>Plaintiffs' Motion</u>, Exh. F, <u>FRA Tables of On-Duty Railroad Employee Injuries, 2004, 2005, 2006</u>; <u>Plaintiffs' Motion</u>, at 10.  In 2005, 289 employees of the Plaintiffs suffered FRA reportable on-the-job injuries in Illinois.  <u>Id.</u>  And in the first 7 months of 2006, 129 employees of the Plaintiffs suffered FRA reportable on-the-job injuries.  <u>Id.</u>  The record shows that, in operating their railroad carriers on a daily basis in Illinois, the Plaintiffs are vulnerable to complaints from employees and/or their union representatives for the Plaintiffs' alleged failure to provide prompt medical attention, or their alleged harassment of injured employees calculated to discourage the employees from receiving prompt medical attention or treatment.  The record discloses that the Plaintiffs have received complaints from their employees concerning the Plaintiffs' alleged interference with medical treatment, some of which have resulted in FRA investigations of these complaints within the past three years.  <u>See</u> <u>FRA Inspection Reports and Violation Notices</u>; <u>Employee and Union Complaints</u>.  The evidence supports a finding that a threat of

prosecution resulting from the Plaintiffs' failure to comply with the mandates of the IREMTA is real and actual, not imaginary or speculative. The Court finds the Plaintiffs' challenges to the IREMTA present a real case or controversy because the Plaintiffs have demonstrated that they have a sufficient personal stake in a determination of whether the IREMTA is constitutionally valid.  See Babbitt, 442 U.S. at 299 n. 11.

Plaintiffs have also presented evidence to show a causal connection between the injury and the conduct complained of.  Because the Defendants have not disavowed their intention to enforce the IREMTA, Plaintiffs face a real and credible threat of prosecution.  Further, a favorable judicial resolution of the preemption issue likely will redress the injury because the additional burden placed on the Plaintiffs to comply with the directives of the IREMTA would be eliminated.  Plaintiffs have standing to bring this lawsuit.  The Defendants' Motion for Summary Judgment is denied on this basis.

Defendants cite to Schmidling v. City of Chicago for the proposition that the Plaintiffs' mere fear of prosecution, without an allegation of immediate threat of injury, is not enough to establish standing.  Schmidling, 1 F.3d 494, 499 (7th Cir. 1993) (finding that "anticipation, fervor of

advocacy, speculation, or even fear is not enough by itself to establish standing.").   The Defendants' reliance on <u>Schmidling</u>, however, is misplaced.   In <u>Schmidling</u>, the defendant moved to dismiss the plaintiffs' complaint for lack of standing.   In ruling on the motion to dismiss, the district court and the Seventh Circuit relied solely on the allegations set forth in the plaintiffs' complaint and determined that the plaintiffs had not alleged enough facts to demonstrate standing.   Here, however, the Plaintiffs have presented sufficient evidence in their Motion for Summary Judgment demonstrating that they have standing to maintain this lawsuit.

C.     <u>Preemption</u>

"The Supremacy Clause to the United States Constitution provides that 'the Laws of the United States . . . shall be the supreme Law of the Land.' Art. VI, cl. 2." <u>City of Kendallville</u>, 251 F.3d at1153.  Congress derives its power to preempt state law from this clause. <u>Id.</u>  Unless Congress expressly declares so, courts must be mindful, when evaluating whether a federal law preempts a state statute, that the state's traditional police powers are not to be superseded by a federal act.   <u>Southern Pacific Transportation Company v. Public Utility Commission of the State of Oregon</u>, 9 F.3d 807, 810 (9th Cir. 1993) (quoting <u>Cipollone v. Liggett</u>

Group Inc., 505 U.S. 504, 516 (1992)).   There are three categories of preemption: (1) express preemption occurs when Congress expressly declares its intention to preempt state regulation through a direct statement in the text of federal law; (2) implied preemption occurs by implication in the "structure and purpose" of federal law showing a Congressional intent to preempt state law; and (3) preemption can lastly occur when the state and federal law conflict in such a way that it is, for example, impossible for a private party to comply with both federal and state law requirements.   Fifth Third Bank v. CSX Corporation, 415 F.3d 741, 745-46 (7th Cir. 2005).

This case concerns express preemption because the FRSA contains an express preemption provision, as quoted above.  Under the FRSA, "A State is permitted to enact a law 'related to railroad safety or security' until the United States Department of Transportation (DOT) . . . issues a regulation 'covering the subject matter of the State requirement.'  Even after such a federal regulation issues, a State may adopt a more stringent law when 'necessary to eliminate or reduce an essentially local safety or security hazard' if it 'is not incompatible' with the federal regulation and 'does not unreasonably burden interstate commerce.'"   CSX Transportation, Inc. v. Williams, 406 F.3d 667, 670 (D.C. Cir. 2005) (citing 49 U.S.C. § 20106)).

26

Congress expressly intended that the FRSA would preempt all railroad safety legislation with [two] specific exceptions noted above. "Because the intent of Congress controls on issues of preemption, '[i]f the statute contains an express preemption clause [as in this case], the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" Chambers v. Osteonics Corp., 109 F.3d 1243, 1246 (7th Cir. 1997).

The Supreme Court has stated that: "[t]o prevail on the claim that the regulations have pre-emptive effect, [Plaintiffs] must establish more than that they 'touch upon' or 'relate to' that subject matter[.]" CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664 (1993). Plaintiffs must demonstrate that § 225.33 covers the subject matter of the relevant state law, meaning that the FRA regulation substantially subsumes the subject matter of the IREMTA. Id. "The term 'covering' is in turn employed within a provision that displays considerable solicitude for state law in that its express preemption clause is both prefaced and succeeded by express saving clauses." Southern Pacific Transportation Company, 9 F.3d at 812. "In Easterwood, [the Supreme] Court made clear that in light of the

restrictive term 'cover' and the express savings clauses in the FRSA, FRSA preemption is even more disfavored than preemption generally." Id. at 813. Further, the Easterwood Court did not look at broad categories such as 'railroad safety' to determine whether a state statute had been preempted. The Supreme Court rather focused on the specific subject matter contained in the federal regulation.  Id. at 812-13; Frank v. Delta Airlines Inc., 314 F.3d 195, 200 (5th Cir. 2002)(quoting United Transp. Union v. Foster, 205 F.3d 851, 860 (5th Cir. 2000)).  The Supreme Court also explained that "Section [20106 of the FRSA, the provision directing that regulations related to railroad safety shall be nationally uniform to the extent practicable] does not . . . call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter of [the state statute]. Easterwood, 507 U.S. at 675.

Applying the preemption test announced in Easterwood, the Court concludes that § 225.33 preempts the IREMTA.  Although not couched in the same terms, the FRA regulation substantially subsumes the subject matter covered in the IREMTA.  Section 225.33 addresses two subject matters: (1) the regulation requires the railroads to adopt and comply with

an internal control plan that contains a policy statement declaring the railroad's commitment to accurate reporting of injuries, and (2) the regulation mandates the railroads to adopt policy statements in their internal control plans indicating that any harassment or intimidation calculated to discourage or prevent an employee injured in the course of employment from seeking medical treatment or from reporting such accident is prohibited.[10]   Although not labeled in identical terms, the IREMTA similarly obligates the railroads to make a good faith effort to provide prompt medical attention for a railroad employee who is injured in the course of employment.  610 ILCS 107/10.  In that effort, the IREMTA states that it is unlawful for railroads and their employees to deny, delay, or interfere with medical treatment of an employee injured on the job, or discipline or threaten discipline to an employee injured on the job for seeking medical treatment or for following the orders or treatment plan of his or her treating physician.  The Seventh Circuit has stated that, if there is a federal regulation directly addressing the subject matter of the state statute, courts need not look at all related regulations to determine whether

---

[10]The Court notes that the Court of Appeals for the Third Circuit has held that § 225 preempts a state requirement that railroads file monthly accident reports.  See Coleman, 542 F.2d at 13-14.

the state statute has been preempted.  <u>Doyle</u>, 186 F.3d at 797.  Here, §
225.33 directly addresses the subject matter of the IREMTA.  The Court
thus need not look at related regulations to determine § 225.33's
preemptive effect.

The Ninth Circuit's decision in <u>Union Pacific Railroad Company</u>
further supports this Court's conclusion that the FRSA preempts the
IREMTA.   One issue posed in that case was whether a regulation
promulgated by the FRA mandating employee training to increase
compliance with the Railroads' internal operating rules covers the same
subject matter as a state regulation mandating compliance with the
Railroads' internal track-train dynamics rules through civil penalties.  <u>Union
Pacific Railroad Company</u>, 346 F.3d at 864.  The Ninth Circuit explained
that Part 217 (the federal regulation at issue) "does not require the
Railroads to comply with any regulations, but rather sets the stage for
further rulemaking.  The federal government determined that, as an initial
matter, it would test compliance with the railroads' operating rules.
Although it took initial steps in determining whether a railroad should be
penalized for a violation of its own rule, it never penalized negligent
compliance."  <u>Id.</u> at 865-66.  The Court concluded that the FRA did not

cover the same subject matter as the state regulation.  The Court noted that "the FRA was aware that dangers existed, but it chose to test compliance rates rather than seek to mandate compliance with any particular rule."  <u>Id.</u> at 866.  The Court found that this was insufficient to preempt the state regulation.

Here, however, the FRA specifically chose to mandate compliance rather than test compliance.  The FRA has announced that a civil monetary penalty would be assessed not only against the employees of the railroads, but also against the railroads themselves for violating the harassment/intimidation policy.  The FRA has declared that:

> it will be diligent in its efforts to ensure that all parties adhere to and comply with the intimidation and harassment policy in the ICP.  It should be noted that FRA will be aggressive in pursuing enforcement sanctions against any person found to be in violation of the railroad's harassment and intimidation policy.
>
> . . . . FRA believes that imposition of a monetary penalty and other enforcement sanctions on the reporting railroad and against individuals as discussed above provides an incentive for the reporting railroad and all parties to observe and follow its internal control procedures.

<u>Plaintiffs' Motion</u>, Exh. A, <u>Cited pages from the Federal Register</u>, at 11; 61 Fed. Reg. 30944 (1996).  The FRA has additionally declared that if a

reporting violation is found, the railroad may be fined for both the reporting violation and any departure from the internal control plan.  Id. In addition, the FRA announced that it explicitly chose to delete the language in § 225.33(b) providing that the railroads make a reasonable and conscientious effort to adhere to their internal control plans to eliminate "variability in perceptions of compliance."  Id.

The record discloses that, in accordance with the mandates of § 225.33, each Plaintiff has adopted an internal control plan that contains written policy statements noting that intimidation or harassment calculated to prevent or discourage a railroad employee from receiving proper medical treatment is prohibited.  See Plaintiffs' Motion, Exhs. (B)(1), (B)(2), Plaintiffs' Internal Control Plans.[11]  The evidence is sufficient to show that,

---

[11]For example, Amtrak's Accident/Incident Reporting Internal Control Plan includes an "Harassment or Intimidation Policy Statement", which reads in relevant part:

Amtrak is committed to complying with the letter and spirit of the Federal Railroad Administration's accident reporting regulations.  Accordingly, Amtrak requires that any accident, incident, injury or illness, arising from the operation of the railroad be reported accurately and completely.  Amtrak will, under no circumstances, tolerate harassing or intimidating conduct by any employee that is calculated to discourage or prevent any individual from receiving proper medical treatment or from reporting an accident, incident, injury or illness.

Any employee who engages in such harassing or intimidating conduct as stated in the procedure below, will be subject to discipline, up to and including termination.  In addition, civil monetary penalties can be assessed against any railroad employee, executive, manager or supervisor,

unlike the FRA regulation at issue in <u>Union Pacific Railroad Company</u>, with respect to § 225.33, the FRA specifically chose to mandate compliance rather than test compliance.  Section 225.33 covers the subject matter addressed in IREMTA and, therefore, preempts the IREMTA.

Defendants, however, argue that: (1) because the Secretary of Transportation did not authorize the FRA to promulgate regulations under the FRSA of 1994, the FRA had no authority to promulgate and enforce § 225.33 and so, any enforcement actions undertaken by the FRA under the FRSA of 1994 are <u>ultra</u> <u>vires</u> and <u>void</u> <u>ab</u> <u>inito</u>; (2) even if the FRA had the authority under the FRSA of 1994 to issue regulations generally, it lacked the authority to issue § 225.33 because the FRSA does not grant the Secretary the power to regulate in the area of healthcare, an area traditionally regulated by the states; (3) § 225.33 only mandates the

---

who willfully causes a violation of non-compliance with any part of **49 CFR Part 225** by the Federal Railroad Administration.

\* \* \* \*

Exh. B(2), <u>Amtrak's Internal Control Plan</u>.

The Court notes that Plaintiff Amtrak has submitted a Declaration to the Court establishing the authenticity of its Internal Control Plan.  Additionally, Union Pacific Railway Company, The Kansas City Southern Railway Company, Norfolk Southern Railway Company, BNSF Railway Company, CSX Transportation, Inc., Canadian Pacific Railway, and Illinois Central Railroad Company have submitted Declarations to the Court establishing the authenticity of their Internal Control Plans.  See <u>Attachments to Plaintiffs' Combined Response</u>.

railroads to adopt and maintain internal control plans containing certain policy statements, but the regulation itself does not require the railroads and their employees to render prompt medical treatment to injured employees, nor does it prohibit harassing or intimidating conduct by any employee of the railroads or by any railroad that is calculated to discourage or prevent an injured employee from seeking proper medical treatment; (4) § 225.33 merely abdicates to the railroads to devise their own policies and penalties for violation within their internal control plan, which is contrary to the FRSA's purpose of creating nationally uniform law or regulation relating to railroad safety or security; and (5) in reading § 225.33 paria materia with Part 225 of the regulation in which it is contained, it is clear that the purpose of the FRSA is to provide accurate reporting of hazards and risks that exist on the nation's railroads, not to regulate in the area of healthcare, an area traditionally governed by state law.  The Court will address each of the five arguments in turn.

Defendants contend that, as a preliminary matter, the FRA had no valid authority under the FRSA of 1994 to promulgate and enforce § 225.33, rendering the federal regulation ultra vires and void ab inito. Defendants cite no controlling authority in support of this assertion.

34

Defendants explain that, since the FRSA of 1970 was reenacted and recodified in 1994, the Secretary of Transportation has not reauthorized the FRA with the authority to promulgate and issue regulations under the 1994 Act. This argument is unavailing. As noted supra, the Seventh Circuit has stated that the FRSA was recodified *without substantial* change in Title 49 as part of a recodification of rail safety laws in 1994. Doyle, 186 F.3d at 795 n. 3. More importantly, § 1(a) of the 1994 Act declared:

> SECTION 1: (a) Certain general and permanent laws of the United States related to transportation, are revised, codified, and enacted by subsections (c)-(e) of this section without substantive change as subtitles II, III, and V-X of title 49, United States Code, "Transportation". Those laws may be cited as "49 U.S.C. -------".

Pub. L. No. 103-272. The Court has reviewed the laws that were repealed by the 1994 Act and notes that the repealed laws have no effect in this case. As such, there was no need for the Secretary of Transportation to re-authorize the FRA to issue regulations under the FRSA of 1994. Moreover, if Congress had intended to abrogate the FRA's authority to prescribe orders and issue regulations under the FRSA, it would have stated so. Congress did not abrogate the FRA's authority.

The FRA's authority to issue regulations relating to railroad safety

matters is valid. Defendants' Motion for Summary Judgment is denied on this basis.

Defendants next contend that, even if the FRA has a valid authority under the 1994 Act to issue regulations relating to railroad safety, the FRA nonetheless lacks authority to regulate in the area of healthcare, an area traditionally governed by state law. According to the Defendants, the IREMTA is not a statute concerning railroad safety or railroad security; rather, the Illinois statute concerns the area of healthcare. Defendants therefore argue that, to the extent § 225.33 regulates in the area of healthcare, the regulation encroaches on the state's police powers. Michigan Southern Railroad Company, 251 F.3d at 1153-54; See Easterwood, 597 U.S. at 658.

Defendants' argument is without merit. As explained supra, the Defendants' focus on broad categories such as "railroad safety" is not the proper focus in analyzing whether § 225.33 covers the subject matter addressed in the IREMTA. Providing prompt medical attention for a railroad employee who is injured in the course of employment necessarily encompasses safety concerns; it enhances accurate reporting of accidents and ultimately serves to reduce railroad related accidents. It "would

[indeed] facilitate the achievement of this national goal by assisting the FRA in identifying the causes of railroad accidents, thereby enabling the responsible federal authorities to promulgate appropriate safety standards." Coleman, 542 F.2d at 14. The proper focus is therefore the narrow category of subject matter that § 225.33 addresses, which is medical treatment for railroad employees injured on the job. In looking at the narrow category of subject matter of § 225.33 and that of the IREMTA, the Court believes that the FRA regulation and the Illinois statute both deal with medical treatment for railroad employees injured in the course of their work, and the federal regulation provides at least as much protection to the injured employees as the Illinois statute. Both prohibit discouraging or preventing an injured employee from getting treated, although the provisions are worded differently. The provision of prompt medical attention or treatment to employees injured in the course of railroad employment falls within Congress' legitimate power to regulate issues concerning railroad safety. Defendants' Motion for Summary Judgment is denied on this basis.

Next, Defendants argue that § 225.33 only mandates railroads to adopt an internal control plan containing specific policy statements. Defendants contend that the federal regulation would only be violated if a

railroad failed to adopt an internal control plan containing the policy statements.   Defendants' contention is unavailing.   Contrary to the Defendants' assertion, however, in enacting § 225.33 the FRA specifically announced that it will be aggressive in pursuing enforcement sanctions against anyone found to be in violation of the harassment/intimidation policy.   The FRA reiterated their commitment to vigorously enforce the harassment/intimidation policy in its May 1, 2003, publication.   <u>See Plaintiffs' Motion</u>, Exh. C. <u>"FRA Guide for Preparing Accident/Incident Reports," (May 1, 2003)</u>.   Even the railroads themselves can be assessed a civil monetary penalty for violating the harassment/intimidation policy.   The FRSA's current schedule of civil penalties for a violation of the harassment/intimidation policy is a clear indication that § 225.33 is not limited to requiring the railroads to simply adopt an internal control plan. The evidence in the record further reveals that the Plaintiffs and their employees have been cited and fined by the FRA for violating the harassment/intimidation policy. <u>See</u> <u>FRA Inspection Reports and Violation Notices</u>.   Defendants' Motion for Summary Judgment is denied on this basis.

Without citation to any controlling authority, Defendants next assert

that § 225.33 merely abdicates to the railroads the requirement to come up with their own policies and penalties for violations within their internal control plan, which is contrary to the FRSA's purpose of creating nationally uniform law or regulation. Defendants explain their position as follows:

> There is no uniformity at all in the application of the provisions. The regulations dubiously puts the power of legislature, executive and judicial in the hands of the railroad. The railroad is charged with defining its policy, investigating and enforcing its own policy, the penalties therefore, and sitting in judgment over itself as to whether there has been a violation. In the words of James Madison "the accumulation of all power legislative, executive and judiciary in the same hands 'may justly be pronounced the very definition of tyranny.'"

Defendants' Motion, at 19. Defendants' argument lacks merit. The Court does not see that the effect of § 225.33 amounts to an accumulation of all power legislative, executive and judiciary in the hands of the railroads. As discussed supra, the FRA is directly involved in the aggressive and active enforcement of the harassment/intimidation policy. The evidence in the record shows that the FRA has cited and fined the Plaintiffs for delaying or interfering with medical treatment of railroad employees injured in the course of employment. If the FRA intended the enforcement of § 225.33 to be left solely to the railroads, as asserted by the Defendants, it would not have declared that it would be vigorous in enforcing compliance with the

harassment/intimidation policy, nor would it have prescribed civil monetary penalties for non-compliance with such a policy.

Moreover, federal Courts of Appeal, such as the D.C. Circuit, the Ninth Circuit, and the Third Circuit, have found that the FRA regulations requiring the railroads to establish internal plans have the same preemptive effect as the FRA regulations directly regulating certain subject areas concerning railroad safety.  As noted supra, the Third Circuit has held that § 225 preempted state accident reporting requirements.  Coleman, 542 F.2d at 14-15.   The D.C. Circuit in Williams held that the plaintiffs demonstrated that they were likely to succeed on their claim that, under the FRSA, a federal rule promulgated pursuant to the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 et seq., requiring rail carriers to develop and implement security plans for transporting hazardous materials, preempted an emergency legislation passed by the D.C. Council.  Williams, 406 F.3d at 671-72.  The Ninth Circuit has held that a federal regulation promulgated under the FRSA, requiring railroads to conduct employee training, but not regulating the content of the railroads' training program, preempted a similar state statute.  Union Pacific Railroad Company, 346 F.3d at 868.

Defendants lastly argue that § 225.33 only preempts state law to the extent the state law regulates accident or incident reporting requirements. In support of their assertion, the Defendants direct the Court's attention to Part 225, asserting that "in determining what section 225.33 preempts, the Court should look at what the FRA identified as the express purpose and what the FRA intended the provisions in Part 225 to preempt." Defendants' Motion, at 21. Pointing to 49 C.F.R. 225.1, Defendants assert that the stated purpose of Part 225 is to provide the FRA with accurate information concerning the hazards and risks that exist on the nation's railroads, not to regulate in the area of healthcare relating to provisions of prompt medical treatment or attention to railroad employees injured on the job. Defendants' reliance on Part 225 to argue that the purpose of § 225.33 is solely limited to regulating accident reporting requirements is contrary to the Supreme Court's teachings in Easterwood. The Supreme Court instructed that § 20106 of the FRSA "does not . . . call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter . . . ." Easterwood, 507 U.S. at 675. As such, to determine whether IREMTA is preempted, this Court must focus on § 225.33. For the reasons explained

supra, § 225.33 covers the subject matter addressed in IREMTA, and thus, preempts the state statute. The Defendants' Motion for Summary Judgment is denied on this basis.

The Court notes that the Defendants do not rely on the second savings clause that the state is imposing a more stringent regulation to address a local safety problem. The Court, however, will briefly examine whether the IREMTA addresses an essentially local safety or security hazard. "The Congress intended that this exception apply 'when local situations are not capable of being adequately encompassed within uniform national standards.'" Williams, 406 F.3d at 672 (citing cases). Defendants have presented no evidence suggesting that the risk of harassment or interference that injured railroad employees face in Illinois is "materially different from the risks encountered" by injured railroad employees in other states. Union Pacific Railroad Company, 346 F.3d at 861. As such, the Court believes that the subject matter addressed in the IREMTA can be adequately addressed by national standards. See id. at 862. The Court accordingly finds that the IREMTA fails to meet the safety hazard exception set forth in the FRSA. The Court thus need not decide whether the IREMTA interferes with interstate commerce.

THEREFORE, for the reasons set forth above, the Court allows Plaintiffs' Motion for Summary Judgment (d/e 20), and denies the Defendants' Motion for Summary Judgment (d/e 22).  The Court declares that the Illinois Railroad Employees Medical Treatment Act is preempted by the Federal Railroad Safety Act.  Defendants are enjoined from taking any action to enforce the Illinois Railroad Employees Safety Act against any of the Plaintiffs.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   January 18, 2007.

FOR THE COURT:

s/  Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE